Reese J.
delivered the opinion of the court.
The first enquiry arising upon this record is, did the circuit court err on the trial, in putting to the prisoner as competent jurors, and imposing upon him the necessity of accepting of challenging, peremptorily, Joseph Link, Charles J. F. Wharton, Anderson Tucker and Matthew Barrow, all of whom stated that they had formed opinions of the guilt or innocence of the prisoner, some of them, that they had formed and expressed such opinión in each instance upon public rumor, and in one instance, that of Wharton, in addition to public rumor, upon a detail of the circumstances from persons, however, Who did not profess to have been eye witnesses of the transaction. The jury having in their hands the life or liberty of the prisoner, on the one side, and the duty of vindicating the violated law, on the other, it has always been deemed of high importance that they should as far as possible, stand indifferent between the supposed criminal and the State. Amid the crowded population and busy pursuits of a community like England, divided too, into classes, which take, perhaps, no very lively interest in each other’s fate or concerns; and it may be added, where the frequency of crime deprives it of the power to produce much public excitement, it may not be very difficult, perhaps, to find a jury unaffected by rumor; but *193 in an agricultural community like ours, of sparse population, identical pursuits, equal siation and infrequent crime, it lias-always been found a matter of much delicacy and difficulty, if not altogether impracticable to procure a jury entirely miaiiected by rumors touching the transactions of a criminal nature upon which they are called to pass. This, it is probable, lias produced a practice upon this subject, very general it is believed with our circuit courts, such as was adopted in the case before us. It is not improbable, also, tuat this practice was fortified by some unreported decisions of our supreme court. Bo this as it may, it becomes our duty to lay down some rules on the subject, which, while they adhere to the ancient principle that a jury must be omni exceplione majoris, shall be adapted to the character and circumstances of our community, and to the just, impartial, and successful administration of the laws; and ■the rule is this; if it appears to the judge, who under our system is the trier of the competency of the juror, that he has heard the circumstances of the case, and believing the statements he has heard to be true, has formed, or formed and ex1pressed an opinion, that is, has made up bis mind as to the guilt or innocence of the prisoner, he ought to be rejected.
This in substance, we believe has been the rule and course, with considerable uniformity, adopted and enforced within the State. In one of the instances excepted to, that of Wharton, the juror seems to have formed his opinion and belief, not upon rumor merely, but upon a detail of circumstances from persons in whom he seems to have confided, and we think he ought to have been rejected for cause. But the record does not show, that the prisoner exhausted liis list of peremptory challenges, and if he did not, and he elected a jury omni exception majoris, leaving peremptory challenges unexhausted, we are of opinion that it does not constitute an error for rvhioh we ought to reverse the judgement,
2. Can aiders and abetters, present and assisting in the dealing at faro, be found guilty of this statutory felony, or can he only be guilty within the meaning of the statute, who does the manual act of dealing. It is argued by the counsel for the prisoner, that this offence of dealing at faro, and of course, also, those of playing with thimble, and exhibiting the grand-mo- *194 irick’ so calle<3> created by the same statute felonies'*leaving by the act of 1827, been rendered infamous, can only ha committed by the one individual who may hold in his hands the cards or thimbles; and they are attempted to be assimilated to the cases mentioned in Hale 468, 527: 4 Burrows 2076, and 2 East 700, arising under the statutes which take away clergy from the offences of stabbing, stealing privately from the person, entering and stealing from dwelling houses. These statutes do not create the offence or the felony, but take away clergy; their object was to capitally punish him, whose hand held the knife, picked the pocket, or him who actually entered the house; the aider and abetter was still punished as a felon, but had his clergy; such are those decisions. We are not aware of any principle in the criminal lav/, which establishes the provision, that where a statute creates a felony, those present, and aiding and abetting cannot .be charged and convicted as principals. In faro, in thimble, in the grand-mother’s trick, for aught we know, the manual act may be performed by a machine, a slave, a servant, a reckless or half-witted mendicant, whose poverty, as much as ir.s will, consents to the deed, and whom the law would scarcely choose to punish, while the owner of the house¡ of the funds, of the profits* the manager of the whole affair, in short, may be present, aiding, abetting, and superintending the entire concern. Such an one, we think a dealer within the meaning of the statute, and in this part of the charge, we think there is no error.
3. In the charge to the jury, the judge said, “that the court was to be the judge of the law, and the jury exclusively the judges of matters of fact, and it was the duty of the jury to receive the law as laid down and expounded by the court, and that the jury were not die exclusive judges of the law.” This point of the charge is excepted to, and may perhaps be wanting in precision. It might bo inferred from it, that the counsel for the prisoner, had urged upon the trial, that the jury in criminal cases, arc the exclusive judges of the law. If this were contended for in a sense, which implied that it was not the duty and office of the judge so to lay down and expound the law to the jury, and highly proper in them to receive irem the court the law, with attention, wih *195 deference, with respect, and to give effect to it as expounded, unless in their conscience they believed him to be wrong, the argument, if such were used, was not well founded. Of course, the position that they were the exclusive judges of the facts related to their present power of finding a verdict, for however exclusively for that purpose they might judge, if they judged against the weight of testimony and against the prison, cr, also, it would have then been the duty of the judge ⅛ have set asido their verdict, upon his judgment of the facts. On the other hand, when the court says, “that the court was to he the judge of the law, and that it was the duty of the jury to receive the lavr ns laid down and expounded by the court, the proposition is made perhaps, somewhat too strongly. The long contest in England on the law of libel, and the relative powers and duties of courts and juries in those cases which took place between judges, lawyers, and statesmen, and which resulted in an act of Parliament, which was the evidence of the triumph of the liberal and popular side of the question, produced, perhaps, the clause in our bill of rights, which declares the jury to be judges of law as well as facts, in libel cases, as they were in all others. Upon this point we adopt the language and opinion of the court in the case in 10 Pick. Rep. 496: “As the jury have the right, and if required by the prisoner, are bound to return a general verdict of guilty or not guilty, they must necessarily in the discharge of this duty, decide such questions of law as well as of fact, as are involved in this general question, and there is no mode in which their opinions upon qiiesíions of law can he reviewed by this court or any other tribunal. Bui this does not diminish the obligation of the court to explain the law. The instructions of the court in matters of law, may safely guide the consciences of the jury, unless they know them to be wrong; and when the jury undertake to decide the law (as they undoubtedly have the power to do) in opposition to the advice of the court, they assume a high responsibility, and should he very careful to see clearly, thailhey are right.” But although these abstract propositions are put by the judge, some of them perhaps inaccurately, and others it may be too strongly, yet taken in the aggregate, and with reference to their bearing upon the case, *196 we are unab]e ⅛0 gome to the conclusion, that they constitute ground of error, upon which we ought to reverse.
4. The court charged the jury, that if the game proved was not substantially different from, and was a species of faro, hut differing in some particulars only, then in contemplation of law, it would be faro, if it was within the mischief of the act under which he was indicted. This part of the charge is also, excepted to. It seems from the proof, that up to the end of the year 1827, a game was played with fifty-two cards, which was universally called faro, by gamblers and the public. Attheendof the year 1827, or in the year 1828, old faro was abandoned, or rather, some changes took place in it; some cards were subtracted, but the principle of the game remained the same, it was a stronger game in favor of the dealer, and against his adversary. It was called forty-eight, by some dealers and gamblers, but most generally by the public, as before, faro. This modification of the game, and attempt to change the name proceeded no doubt, from the act of 1827, having made those guilty of dealing faro, playing at thimbles, and exhibiting the grand-mother’s trick, subject (o pillory and infamy. And when the act of 1329, passed according to the proof in this case, the old game of faro with fifty-two cards had ceased to be played and forty-eight, or the new faro, commonly then known by the name of faro, was in existence, or more frequently used, invented no doubt, to elude the act of 1827. We think the charge of the court upon this point correct. If the principle of the game remained, and the game substantially continued the same, changes and modifications which did not materially alter the nature and character of the game, would not destroy its legal and statutory identity.
5; But the court further told the jury, “if the game of forty-eight, was substantially a different game from old faro, but was commonly called and well known by the name of faro, in this State, and at Nashville, at and before the finding the bill of indictment against McGowan, it would be faro, within the meaning of the law, if it was within the mischief, to remedy which the act was made.” This proposition in the charge is excepted to, and we think it clearly erroneous. If the charge had been upon this point, in the identical terms of the above *197 proposition, substituting only the words, at or before the age of the act of 1829,for the words, at and before the finding of the bill of indictment, the proposition would have been not only correct, we think, in point of law, but relevant also, to much testimony in the cause. A substantially different game, it is here said, from that intended in the act, but which acquires the same name subsequently, if it fall within the mischief to remedy which the act was made, becomes indictable under it. If this be so, it must be by the offence falling within the mischief, and cannot arise, from the acquisition ol the name. It is unnecessary to argue, that if a statutory felony be created, different offences from that created by the statute, but falling within the mischief to be prevented, cannot be considered and punished as identical with the statutory felony.
6. To this, another proposition intended to sustain it is annexed, in the charge of the court, namely, “that the acts of Assembly against gaming were to be construed remedially, and not strictly, and if the game of forty-eight was within the mischief and meaning of the act, it was sufficient to embrace this case.” That a statute creating a felony, shall have a remedial construction, is a principle no where established. An act of Assembly in 1824, directed that all statutes made for the suppression of gaming, should be remedially construed. Every species of gaming then punished by law, was considered and treated as a misdemeanor. But when faro, in 1827, was rendered infamous, and in 1829 a felony, will it be proper to apply to it, the rule of construction created by the act of 1824, and applicable only to misdemeanors. We think not clearly.
For the reasons herein stated, the judgment of the circuit cou;t will be reversed, and the cause be remanded to the circuit court to be there tried again.
Judgment reversed.